Harold FRANK and Forest County Potawatomi Community of Wisconsin, Plaintiffs,

v.

FOREST COUNTY, the Forest County Board of Supervisors, and Elizabeth Ison, in her Official Capacity, Defendants.

No. 01–C0847.

United States District Court, E.D. Wisconsin.

March 22, 2002.

Matthew W. O'Neill, Friebert, Finerty & St. John, S.C., Milwaukee, WI, for Plaintiff or Petitioner.

Nathan A. Fishbach, Whyte Hirschboeck Dudek, S.C., Milwaukee, WI, for Defendant or Respondent.

### DECISION AND ORDER

CURRAN, District Judge.

The Forest County Potawatomi Community of Wisconsin, a federally recognized Indian tribe, and Harold Frank, a member of the tribe, are suing Forest County, Wisconsin, the Forest County Board of Supervisors, and Elizabeth Ison, Forest County Clerk. The Plaintiffs claim that the Defendants' 2001 plan for redistricting the twenty-one Forest County supervisory districts deprives them of equal protection, *see* U.S. Const. amend. XIV, and violates Section 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973(b). The Plaintiffs ask that the 2001 plan be declared unconstitutional and that the election of Forest County supervisors scheduled for April 2, 2002, be enjoined. *See* 42 U.S.C. § 1983. Subject matter jurisdiction and venue are proper in this district. *See* 28 U.S.C. §§ 1331 & 1391. The Defendants have answered and have denied liability and that the Plaintiffs are entitled to any relief.

The parties filed cross motions for summary judgment. Then, after this case was transferred to this court, the motions and request for injunctive relief were combined with a trial to the court. The trial has now concluded, so the court will enter its findings of fact and conclusions of law. *See* Federal Rule of Civil Procedure 52.

### I. FINDINGS OF FACT

Forest County is a sparsely populated county located on and near the northeastern boundary of the State of Wisconsin.

With an area of 1,014.1 square miles and a total population of 10,024, the population density is 9.9 persons per square mile.[1] The county contains only one city-Crandon, the county seat-and fourteen towns.

During the decade from 1991 to 2000, Forest County's population increased 5.99%. Therefore, pursuant to state law, the twenty-one member County Board of Supervisors undertook to redistrict the supervisory districts based upon the results of the decennial United States Census for the year 2000. *See* Wis. Stat. § 59.110(3)(b)(1).

After the Board of Supervisors adopted its 2001 plan, the Defendants filed this lawsuit claiming that the plan violates their federal constitutional and statutory rights.

Prior to trial, the parties stipulated to the following historical facts which the court finds are supported by the record:

1. Harold Frank is an adult member of the FCPC and a resident of Forest County.

2. The Forest County Potawatomi Community of Wisconsin ("FCPC") is a federally recognized Indian Tribe with a mailing address of P.O. Box 346, Crandon, Wisconsin 54520.

3. Defendant Forest County (the "County") is a municipal corporation and body corporate pursuant to § 59.01, Wis. Stat.

4. Defendant Forest County Board of Supervisors (the "Board") is the governing body of the County, elected pursuant to § 59.10, Wis. Stats.

5. Defendant Elizabeth Ison, named in her official capacity, is the County Clerk for Forest County, with duties as set forth in § 59.23, Wis. Stats., including those duties with respect to elections as set forth in § 59.23(2)(n), Wis. Stats.

6. This action was commenced on August 22, 2001 pursuant to 42 U.S.C. § 1983 alleging violations of the Voting Rights Act, 42 U.S.C. § 1973, and the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States.

7. Venue is appropriate in the Eastern District of Wisconsin, as all of the acts complained of allegedly occurred in Forest County, Wisconsin.

8. In 2000, the United States Census Bureau conducted a decennial federal census of population. On or about April 2, 2001, Forest County received from the Wisconsin Legislative Reference Bureau ("LRB") the "2000 Federal Census of Population: Wisconsin Block Level Data" for Forest County. The data was extracted by the LRB from the Census 2000 Redistricting Data Summary File for Wisconsin.

9. Pursuant to § 59.10(3)(b), Wis. Stats., the Board began the process of redistricting the county supervisor seats upon the County's receipt of the 2000 Census data.

10. The Board created a County Board Reapportionment Committee ("Reapportionment Committee," also referred to as the "Redistricting Committee"). The Redistricting Committee initially held public meetings regarding redistricting on May 2, 11 and 22, 2001. The meeting of May 22, 2001 included a public hearing.

11. The Board enlisted the services of the North Central Wisconsin Regional Planning Commission ("NCWRPC") to help analyze the census data and prepare tentative supervisory district plans.

1. In contrast, Wisconsin's most populated county, Milwaukee County, has an area of 241.6 square miles with a population of 940,-016.00, resulting in a population density of 3,891.4 persons per square mile.

12. During the redistricting process, the Board and the NCWRPC utilized census data reflecting total population figures.

13. The 1991 Forest County Supervisory District Plan (the "1991 County Plan") included one district with a majority of Native Americans, located in the Town of Nashville (then District 21).

14. A map accurately depicting the 1991 County Plan is attached hereto as Exhibit E.

15. By letter dated April 12, 2001, the FCPC requested that the County create two additional county supervisory districts with a majority of Native Americans. The FCPC requested the creation of Native American majority districts in the Town of Lincoln and the Town of Wabeno. The FCPC presented its request for a Native American district in Wabeno at the May 11, 2001 Redistricting Committee meeting, the May 29, 2001 County Board meeting, the August 14, 2001 Redistricting Committee Meeting and the August 21, 2001 County Board meeting.

16. On May 29, 2001, the Board adopted a tentative supervisory district plan (the "Tentative Plan") pursuant to § 59.10(3)(b)1, Wis. Stats.

17. The Tentative Plan did not include a majority district for the Native Americans residing in Wabeno. Under the Tentative Plan, the Native Americans residing in the Wabeno area were located in Districts 5, 7, and 8, with 42 Native Americans in District 5, 207 Native Americans in District 7, and 35 Native Americans in District 8 (using total population, and not voting age population, figures).

18. By letter dated August 10, 2001 and received by the NCWRPC on August 13, 2001, the FCPC requested that District 7 in the Tentative Plan be adjusted to include an additional 35 Native

Americans (using total population, and not voting age population, figures).

19. With the same letter, the FCPC provided the NCWRPC for the first time with a plan suggesting alternate boundaries for the supervisory districts in the Wabeno area. This Plan will be referred to as "FCPC Plan 1" and is attached as Exhibit B to these Stipulated Findings.

20. The FCPC presented FCPC Plan 1 to the Redistricting Committee for the first time at a public meeting on August 14, 2001. The Redistricting Committee approved the Tentative Plan for recommendation to the Board at that meeting.

21. On August 21, 2001, the Board held a public hearing on the Tentative Plan. During the hearing, the FCPC requested that the Board adopt FCPC Plan 1.

22. On August 21, 2001, the Forest County Board adopted the Tentative Plan as the final supervisory district plan (the "2001 County Plan"). The 2001 County Plan is attached as Exhibit A to these Stipulated Findings.

23. FCPC Plan 1 was received by the NCWRPC from plaintiffs on August 13, 2001 and presented by the FCPC to the Redistricting Committee on August 14, 2001. This plan was prepared by plaintiffs' expert, Frederick P. Kessler. FCPC Plans 2 and 3, which are also prepared by Frederick Kessler, were provided to defendants along with plaintiffs' expert disclosures on November 1, 2001.

24. Copies of maps reflecting the relevant plans, as well as a population analysis of each plan (excerpted from the analyses prepared by defendants' expert Kimball Brace) are attached to these Stipulated Facts. The Exhibits are as follows:

Exhibit A   2001 County Plan (and analyses) (although titled differently, this map shows the same information as the map attached to Brace's report as Exhibit 9)

Exhibit B   FCPC Plan 1 (and analysis)

Exhibit C   FCPC Plan 2 (and analysis)

Exhibit D   FCPC Plan 3 (and analysis)

Exhibit E   1991 County Plan

The population analyses for each 2001 plan show: (1) a summary of the plan and the total or maximum deviation from the ideal district size; (2) the racial breakdown of each plan based on the total population of the districts; and (3) the racial breakdown of each plan based on the voting age population ("VAP") of the districts.

25.   According to the 2000 Census, Forest County has a total population of 10,024 people. With 21 supervisory districts, the so-called "ideal" district size in terms of the "one person, one vote"

doctrine of the Equal Protection Clause is 477 people (10,024/21 = 477.33).

26.   For purposes of plaintiffs' Equal Protection challenge, the "total deviation" (also known as the "maximum deviation") of a plan may be determined by taking the difference between the highest and lowest populated districts and dividing that number by the "ideal" district size of 477.

27.   In the 2001 County Plan, District 2 has the highest population (514) and District 12 has the lowest population (428) (a difference of 86 people). The 2001 County Plan thus has a total or maximum deviation of 18.03% (86/477 = .1803).

28.   The three plans presented by plaintiffs do not alter the boundaries of Districts 2 and 12.

29.   The average deviation for all of the 21 districts under the 2001 County Plan is 3.585%.

30.   The 2000 Census reflected the following population growth in Forest County from 1990 to 2000:

*Change in Population in Forest County*

|  | 1990 | 2000 | Raw Change | % Change | % of Total Pop. Change |
|---|---|---|---|---|---|
| Total Pop | 8,733 | 10,024 | 1,251 | 14.26% | 100% |
| Native Amer. | 777 | 1,173 | 396 | 50.97% | 32% |
| White | 7,822 | 8,570 | 748 | 9.56% | 60% |

31.   In the 2001 County Plan, the Native American population of Districts 13 and 17 is as follows:

a.   In District 13 (located in the Town of Nashville on the Mole Lake Chippewa Reservation), Native Americans constitute 77.68% of the total population. Using voting age population figures, Native Americans represent

75.09% of the population of District 13.

b.   In District 17 (located in the Town of Lincoln), Native Americans constitute 52.64% of the total population and 49.35% of the voting age population.

32.   None of plaintiffs' three plans alters the boundaries of Districts 13 and 17.

33. Plaintiffs' Voting Rights Act challenge is focused on District 7 in the 2001 County Plan.

34. Under the 2000 Census, Wabeno has a total population of 1,264 people.

35. District 7 in the 2001 County Plan is located in Wabeno, and includes portions of the Potawatomi Reservation. As currently adopted, District 7 has the following racial makeup (these Stipulated Facts will include only the figures for White, Native American and Black residents):

*Final Plan—District 7—Total Population*

| DIST. | Total Pop. | White | % of Total | Native Amer. | % of Total | Black | % of Total |
|---|---|---|---|---|---|---|---|
| 7 | 488 | 274 | 56.15% | 207 | 42.42% | 0 | 0.00% |

36. FCPC Plans 1 and 2 have the following racial makeup in District 7:

*FCPC Plans 1 and 2—District 7—Total Population*

| DIST. | Total Pop. | White | % of Total | Native Amer. | % of Total | Black | % of Total |
|---|---|---|---|---|---|---|---|
| 7 | 470 | 221 | 47.02% | 242 | 51.49% | 0 | 0.00% |

*FCPC Plans 1 and 2—District 7—Voting Age Population ("VAP")*

| DIST. | Total VAP | White | % of VAP | Native Amer. | % of VAP | Black | % of VAP |
|---|---|---|---|---|---|---|---|
| 7 | 288 | 163 | 56.60% | 122 | 42.36% | 0 | 0.00% |

37. The third plan prepared the plaintiffs, FCPC Plan 3, has the following racial makeup in District 7:

*FCPC Plan 3—District 7—Total Population*

| Dist. | Total Pop. | White | % of Total | Native Amer. | % of Total | Black | % of Total | Total NA & Black | % of Total |
|---|---|---|---|---|---|---|---|---|---|
| 7 | 481 | 135 | 28.07% | 234 | 48.65% | 96 | 19.96% | 328 | 68.19% |

*FCPC Plan 3—District 7—Voting Age Population ("VAP")*

| Dist. | Total VAP | White | % of VAP | Native Amer. | % of VAP | Black | % of VAP | Total NA & Black | % of VAP |
|---|---|---|---|---|---|---|---|---|---|
| 7 | 297 | 97 | 32.66% | 117 | 39.39% | 72 | 24.24% | 189 | 63.63% |

38. The next regularly scheduled election for the Forest County Board of Supervisors is April 2, 2002.

39. In District 7, a Native American candidate, Louis Spaude, is challenging

the incumbent supervisor, Scott Schaffer, Jr.

40. In District 11, incumbent Erhard Huettl has a challenger, Charles Otter.

41. In District 15, two non-incumbents, Shirley Mills and Alfred Wilson, are running against each other. There is no incumbent running for this seat.

42. In District 16, Chester Gryczkowski is challenging incumbent Jack Kloss.

43. In District 20, Bill Schultz is challenging incumbent Paul E. Spence.

Stipulated Findings of Fact at 1–10 (citations omitted).

## II. CONCLUSIONS OF LAW, DISCUSSION AND DECISION

### A. EQUAL PROTECTION

Based on these facts, the Plaintiffs claim that they have been deprived of the "one person, one vote" [2] guarantee of the Fourteenth Amendment because the twenty-one supervisory districts in Forest County do not contain an equal number of people. The 2000 United States Census shows that the population of Forest County is 10,024. Therefore, ideally, each supervisory district should contain 477 people. In the 2001 County Plan, District 2 has the highest population (514) while District 12 has the lowest population (428). The difference of 86 people results in a maximum deviation of 18.03%.

In *Reynolds v. Sims*, 377 U.S. 533, 560–61, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), the United States Supreme Court applied the Equal Protection Clause's guarantee of one person, one vote to state legislatures, stating that: "the fundamental principle of representative government is one of equal

representation for equal numbers of people, without regard to race, sex, economic status, or place of residence within a state." *See also Avery v. Midland County*, 390 U.S. 474, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968) (applying the one person, one vote principle to local government). In *Sims* and subsequent cases, the Court recognized that precise mathematical population equality is not possible in many cases. *See Reynolds*, 377 U.S. at 577, 84 S.Ct. 1362.

Since *Reynolds*, the Court has refined the parameters for determining when population differences among legislative districts unconstitutionally dilute the votes of the members of the larger districts. In *Gaffney v. Cummings*, 412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973), the Court held that "minor deviations from mathematical equality among state legislative districts are insufficient to make out a *prima facie* case of invidious discrimination under the Fourteenth Amendment so as to require justification by the State." *Id.* at 745, 93 S.Ct. 2321. Similarly, in *White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), the Court said, "we do not consider relatively minor population deviations among state legislative districts to substantially dilute the weight of individual votes in the larger districts so as to deprive individuals in these districts of fair and effective representation." *Id.* at 764, 93 S.Ct. 2332.

The Court has come to recognize what is generally regarded as a benchmark for determining whether a particular apportionment plan violates the one person, one vote principle. In *Brown v. Thomson*, 462 U.S. 835, 103 S.Ct. 2690, 77

---

**2.** The phrase "one person, one vote" does not appear in the Fourteenth Amendment. It derives from the following passage in *Gray v. Sanders*, 372 U.S. 368, 381, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963): "The conception of political equality from the Declaration of Independence, to Lincoln's Gettysburg Address, to the Fifteenth, Seventeenth, and Nineteenth Amendments can mean only one thing-one person, one vote."

L.Ed.2d 214 (1983), the Court observed that: "Our decisions have established, as a general matter, that an apportionment plan with a maximum population deviation under 10% falls within this category of minor deviations. A plan with larger disparities in population, however, creates a *prima facie* case of discrimination and therefore must be justified by the State." *Id.* at 842–43, 103 S.Ct. 2690 (citations omitted); *cf. Connor v. Finch,* 431 U.S. 407, 418, 97 S.Ct. 1828, 52 L.Ed.2d 465 (1977) ("The maximum population deviations of 16.5% in the Senate districts and 19.3% in the House districts can hardly be characterized as *de minimis;* they substantially exceed the 'under–10%' deviations the Court has previously considered to be of prima facie constitutional validity only in the context of legislatively enacted apportionments.") Thus, the Court's one person, one vote cases have generally established three levels for gauging whether population deviations between voting districts violate the Equal Protection Clause. If the maximum deviation is less than 10%, the population differential will be considered *de minimis* and will not, by itself, support a claim of vote dilution. If the maximum deviation is greater than 10%, it is *prima facie* evidence of a one person, one vote violation, and the state may justify the population disparity by showing a rational and legitimate state policy for the districting plan. *Brown,* 462 US. at 842–43, 103 S.Ct. 2690. Finally, there is a level of population disparity beyond which a state can offer no possible justification. Although it is not clear precisely what that upper level is, the Court has stated in dictum that a maximum deviation of 16.4% "may well approach tolerable limits." *Mahan v. Howell,* 410 U.S. 315, 329, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973).

■ In this case, the Plaintiffs have established a *prima facie* case of vote dilution by demonstrating a population deviation in excess of ten percent. *See Voi-*

*novich v. Quilter,* 507 U.S. 146, 161, 113 S.Ct. 1149, 122 L.Ed.2d 500 (1993). Such a showing shifts to the Defendants the burden of justifying the deviation, which requires them: (1) to articulate a rational state policy that may justify the deviation; (2) to explain how the redistricting plan may reasonably be said to advance the rational state policy; and (3) to demonstrate that the resulting deviation does not exceed constitutional limits. *See Mahan v. Howell,* 410 U.S. 315, 328, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973); *Regensburger v. City of Bowling Green, Ohio,* 278 F.3d 588, 595 (6th Cir.2002).

At trial, the Defendants met their burden by proving that the 2001 redistricting plan is rationally related to state policies that justify the deviation. The districts were drawn with regard to traditional redistricting principles: equal population, contiguity, compactness, and respect for municipal boundaries. These considerations reflect the law found in Chapter 59 of the Wisconsin Statutes, which states that the creation of supervisory districts for a county with the population of Forest County is to be determined as follows:

Within 60 days after the population count by block, established in the decennial federal census of population, and maps showing the location and numbering of census blocks become available in printed form from the federal government or are published for distribution by an agency of this state, but no later than July 1 following the year of each decennial census, each board shall propose a tentative county supervisory district plan setting forth the number of supervisory districts and tentative boundaries or a description of boundary requirements, hold a public hearing on the proposed plan and adopt a tentative plan. The proposed plan may be amended after the public hearing. The board shall solicit suggestions from municipalities

concerning the development of an appropriate plan. The board shall transmit to each municipal governing body in the county the tentative plan that is adopted. Each district shall consist of whole wards or municipalities. Each district shall be designated to be represented by one supervisor, and all districts shall be substantially equal in population. In the tentative plan, the board shall, whenever possible, place whole contiguous municipalities or contiguous parts of the same municipality within the same district. If the division of a municipality is sought by the board, the board shall provide with the plan a written statement to the municipality affected by each proposed division specifying the approximate location of the territory from which a ward is sought to be created for contiguity purposes and the approximate population of the ward proposed to effectuate the division.

Wis. Stat. § 59.10(3)(b)(1).

Changes during a decade are to be addressed as follows:

Changes during decade. After the enactment of a plan of supervisory districts under par. (b), a municipal incorporation, annexation, detachment or consolidation may serve as a basis for altering between federal decennial censuses the boundaries or supervisory districts, in the discretion of the board. The number of supervisory districts in the county shall not be changed by any action under this paragraph. Any plan of county supervisory districts enacted under par. (b) may be amended under this paragraph but shall remain in effect as amended until superseded by another plan enacted by the board under par. (b) and filed with the secretary of state.

Wis. Stat. § 59.10(c).

In addition to these state mandated considerations, the Defendants also attempted to avoid diluting the Native American influence in Districts 17 and 13 and to protect existing communities of interest based on the provision of fire fighting and emergency medical services and school district boundaries. In some instances, balancing the population of districts came into conflict with the desire to preserve municipal boundaries. However, Ronald Weber, the Defendants' expert, was able to justify the supervisors' decision to split eight townships. *See* Declaration of Dr. Ronald E. Weber at ¶¶ 10–12. The result was a 2001 plan with an average deviation for all twenty-one districts of 3.585% and a maximum deviation of 18.03%.

Although the maximum deviation in Forest County pushes the outer limits of what has been tolerated by the United States Supreme Court, the court concludes that the Defendants have not violated the Equal Protection Clause. The Defendants have articulated a rational state policy that justifies the deviation; they have explained how their redistricting plan advances the rational state policy; and, they have demonstrated that the resulting deviation does not exceed constitutional limits for local governments. In addition, there is no evidence in the record that the Defendants intended to discriminate against the Plaintiffs. *See Smith v. Boyle,* 144 F.3d 1060, 1064 (7th Cir.1998) ("to be actionable a denial of equal protection must be intentional"). To the contrary, the evidence shows that the Defendants attempted to maximize the ability of the Native Americans in Forest County to elect supervisors of their preference. Therefore, the court will not grant relief on the Plaintiffs' Fourteenth Amendment cause of action.

### III. *VOTING RIGHTS ACT*

Next, the Plaintiffs' claim that Forest County's 2001 plan violates Section 2 of the Voting Rights Act of 1965, as amended. *See* 42 U.S.C. § 1973(b). Section 2 of

the Voting Rights Act prohibits any voting procedure that "results in a denial or abridgement of" the voting rights of a person on account of race, color, or membership in a language minority. 42 U.S.C. § 1973(a). A violation of section 2 is established by showing that "based on the totality of the circumstances," members of a protected class "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 42 U.S.C. § 1973(b). By its terms, Section 2 does not establish an entitlement to proportional representation. Rather, the statute provides that: "The extent to which members of a protected class have been elected to office in the state or political subdivision is one circumstance which may be considered: Provided that nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." 42 U.S.C. § 1973(b). As amended in 1982, the Voting Rights Act (unlike the Equal Protection Clause) does not require proof of intent to discriminate. The burden of proof is on the party seeking to establish a Section 2 violation.

■ The vote dilution inquiry under Section 2 involves two steps. First, Plaintiffs must show that three threshold conditions exist-the *"Gingles"* factors. *See Thornburg v. Gingles,* 478 U.S. 30, 50–51, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). Specifically, Plaintiffs must show that: (1) the population of Native Americans is "sufficiently large and geographically compact to constitute a majority in a single-member district"; (2) Native Americans are "politically cohesive" and (3) "the white majority votes sufficiently as a bloc to enable it in the absence of special circumstances ... usually to defeat the (Native Americans') preferred candidate." *Id.* Second, and only if the three *Gingles* factors are met, the court must decide the ultimate question of vote dilution. In doing so the

Court must determine whether, "on the totality of circumstances," Native Americans have been denied an equal opportunity to participate in the political process and to elect representatives of their choice. *See* 42 U.S.C. § 1973(b).

■ In *Gingles,* the Supreme Court pointed to an exemplary list of factors that are important in any Section 2 vote dilution inquiry. *See Gingles,* 478 U.S. at 44–45, 106 S.Ct. 2752. The factors were taken from a list in the Senate Judiciary Committee Majority Report that accompanied the bill amending the Voting Rights Act in 1982. *Id.* at 36, 106 S.Ct. 2752. The "Senate Factors" to which the *Gingles* Court refers are:

"1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process";

"2. the extent to which voting in the elections of the state or political subdivision is racially polarized";

"3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group";

"4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

"5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process";

"6. whether political campaigns have been characterized by overt or subtle racial appeals";

"7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

"Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are":

"[8.] whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.

"[9.] whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous."

*Id.* at 36–37, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (quoting S.Rep. No. 97–417 at 28–29 (1982)) *reprinted in* U.S.C.C.A.N. 177, 206–07.

■ According to the 2000 census, there are 662 Native Americans of voting age residing in Forest County which has a total voting age population of 7,488. Therefore, Native Americans of voting age comprise 8.84% of the voting age population. The Plaintiffs point out that the total population of Forest County is 10,024, including 1,173 Native Americans, so that Native Americans comprise 11.70% of the total population of Forest County. Using the total population statistics, the Plaintiffs conclude that they are entitled to elect three of the twenty-one county supervisors, while the Defendants maintain that the voting age population statistics justify fewer than two Native American majority districts.

Under the 2001 Forest County plan, supervisory District 13 is located in the Town of Nashville on the Mole Lake Chippewa Reservation. Native Americans constitute 75.09% of the voting age population of that district. In District 17, located in the Town of Lincoln, Native Americans constitute 52.64% of the total population and 49.35% of the voting age population. Although District 17 could be termed an "influence" district rather than a Native American majority district, at trial the Defendants only argued for the creation of one additional Native American majority district. Thus, the Plaintiffs' Voting Rights Act challenge is focused on District 7 in the 2001 plan.

District 7 is located in the Town of Wabeno and includes portions of the Potawatomi Reservation. The total voting age population of District 7 is 288 of which 163 are Caucasians and 122 are Native Americans. The Plaintiffs urge the court to consider the total population (488), rather than voting age population. If total population is considered, 274 people are Caucasian and 207 are Native American. The Plaintiffs point out that the Native American population in the Wabeno area is increasing at a higher rate than in the rest of the Wabeno population, and argue that, under the theory of "virtual representation," the voting age Native Americans would also be representing their children. Therefore, total population figures should be used. Although this theory has been mentioned with mixed sentiments in dictum by Judge Posner, *see Barnett v. City of Chicago*, 141 F.3d 699, 704 (7th Cir.) ("a bizarre suggestion"/"not a ridiculous idea"), *cert. denied sub nom. Bialczak v. Barnett*, 524 U.S. 954, 118 S.Ct. 2372, 141 L.Ed.2d 740 (1998), the concept of virtual representation has been rejected in many contexts throughout the history of this country. *See* Reva B. Siegel, *She the People: The Nineteenth Amendment, Sex Equality, Federalism, and the Family*, 115 HARV, L. REV. 947 (2002) (discussing the pre-Nineteenth Amendment idea that women did not need the vote because their interests were represented by their husbands); Robert W. Bennett, *Should Parents Be Given Extra Votes on Account of*

*Their Children? Toward a Conversational Understanding of American Democracy,* 94 NW. U.L. REV. 503, 522–27 (2000) (relating how the Founders rejected Edmond Burke's and King George III's theory that the colonists were being virtually represented by Englishmen in the British House of Lords); Lani Guinier, *Groups, Representation, and Race–Conscious Districting: A Case of the Emperor's Clothes,* TEX. L. REV. 1589, 1607–12 (1993) (rejecting notion of virtual representation of members of one race which has been deprived of voting rights by members of another race). The theory has never been accepted in a holding of the United States Supreme Court or the Seventh Circuit.[3] Instead, the Seventh Circuit has continued to adhere to the position that citizen voting age population figures must be used to measure proportionality. *See Barnett,* 141 F.3d at 705; *McNeil v. Springfield Park District,* 851 F.2d 937, 944–45 (7th Cir. 1988), *cert. denied,* 490 U.S. 1031, 109 S.Ct. 1769, 104 L.Ed.2d 204 (1989).

■ Faced with a lack of legal and factual support for the Plaintiffs' position, this court must reject that position and will use the voting age population figures. When voting age figures are used, the Plaintiffs' plans 1 and 2 do not meet the first *Gingles* factor-establishing that the Native American population is sufficiently large to constitute a majority in the proposed district. The Plaintiffs recognize this, but continue to argue that, because of the Native American birth rate, the number of Native Americans will exceed the number of other voting age people in the proposed District 7 within a few years.

The Wisconsin Statutes clearly require that redistricting be based upon the decennial census and not upon projections. *See* Wis. Stat. § 59.10. In the face of this statutory provision, the Plaintiffs have offered no legal authority to support the use of total population or projected total population to determine proportionality, so their position must be rejected, leading to the conclusion that their plans 1 and 2 do not pass muster under *Gingles.*

Finally, the Plaintiffs have offered a third plan under which portions of Wabeno would be placed in a district with the Town of Blackwell where a federal Job Corps facility is located. The voting age population of this district would be 297, including 117 Native Americans and 72 African Americans. The Plaintiffs say that the Native Americans and African Americans would comprise a coalition of 189 citizens who could elect a supervisor of their choice. At the same time, the Plaintiffs admit that the African Americans housed at the Blackwell Job Corps do not vote in local elections. Other than the fact that Native Americans in Menominee County, Wisconsin, and African Americans in Milwaukee County, Wisconsin, voted for the Democratic candidate in past presidential elections, the Plaintiffs have offered no evidence to establish a community of interest among the Forest County Native Americans and the Job Corps students. In addition, there is no African American Plaintiff in this case. This not only undercuts the claim of shared interests, but also raises the concern that rulings in this case could have a preclusive effect on any future claims by African Americans in Forest County if the court found that their interests are represented by the Native American Plaintiffs.

---

**3.** Even if these courts had accepted virtual representation in the context of voting, the Plaintiffs in this case have offered no evidence showing that Native American adult voters vote the same as their children would vote if they were eligible. At least one commentator believes that, given the vote, children would not vote like their parents. *See* Vita Wallace, *Give Children the Vote, The Nation,* October 14, 1991, at 439.

Neither the United States Supreme Court nor the Seventh Circuit have held that the Voting Rights Act allows coalitions as proposed by the Plaintiffs. The Sixth Circuit has specifically rejected the concept on the ground that there is no support in the plain language of the statute. *See generally Nixon v. Kent County,* 76 F.3d 1381 (6th Cir.1996). *But see Campos v. City of Baytown, Texas,* 840 F.2d 1240, 1244 (5th Cir.1988), *cert. denied,* 492 U.S. 905, 109 S.Ct. 3213, 106 L.Ed.2d 564 (1989).

Regardless of whether coalitions are allowed under the Voting Rights Act, the Plaintiffs' plan 3 fails to meet the *Gingles* criteria that the group seeking representation prove that it is politically cohesive. This conclusion compels the court to reject the Plaintiffs' third plan and to conclude that the Plaintiffs have not met their burden of proving a violation of Section 2 of the Voting Rights Act.

### ORDER

For the reasons explained above, the court ORDERS that the "Plaintiffs' Motion for Summary Judgment" (filed January 18, 2002) IS DENIED and that their request for injunctive relief is denied.

IT IS FURTHER ORDERED that the Defendants' "Motion for Summary Judgment" (filed January 18, 2002) IS GRANTED.

IT IS FURTHER ORDERED that this action is dismissed upon its merits.

IT IS FURTHER ORDERED that the Clerk of Court shall enter a final judgment as a separate document. *See* Federal Rule of Civil Procedure 58. This judgment shall provide that:

This action brought by Plaintiffs Harold Frank and Forest County of Potawatomi Community of Wisconsin against Defendants Forest County, The Forest County Board of Supervisors, and Elizabeth Ison, in her Official Capacity, came before the court, the Honorable Thomas J. Curran, District Judge, presiding, and a decision having been rendered,

IT IS ORDERED AND ADJUDGED

that the Plaintiffs take nothing and that this action is dismissed upon its merits and that the Defendants recover of the Plaintiffs their costs of this action.

Forest County
Final Plan

Exhibit A
2001
County Plan

US & State Highways
County Highways
Local Roads
Private / Other
Mod Boundaries
Water
District Borders

North Central
Wisconsin Regional
Planning Commission

## FCPC Plan 1 - Summary of Deviation from Ideal Size

| DISTRICT | Total Pop. | Target | Deviation | Raw Dev. |
|---|---|---|---|---|
| 1 | 447 | 477 | -6.36% | -30 |
| 2 | 514 | 477 | 7.68% | 37 |
| 3 | 491 | 477 | 2.86% | 14 |
| 4 | 463 | 477 | -3.00% | -14 |
| 5 | 476 | 477 | -0.28% | -1 |
| 6 | 459 | 477 | -3.84% | -18 |
| 7 | 470 | 477 | -1.54% | -7 |
| 8 | 488 | 477 | 2.24% | 11 |
| 9 | 481 | 477 | 0.77% | 4 |
| 10 | 488 | 477 | 2.24% | 11 |
| 11 | 492 | 477 | 3.07% | 15 |
| 12 | 428 | 477 | -10.34% | -49 |
| 13 | 448 | 477 | -6.15% | -29 |
| 14 | 471 | 477 | -1.33% | -6 |
| 15 | 472 | 477 | -1.12% | -5 |
| 16 | 483 | 477 | 1.19% | 6 |
| 17 | 492 | 477 | 3.07% | 15 |
| 18 | 494 | 477 | 3.49% | 17 |
| 19 | 484 | 477 | 1.40% | 7 |
| 20 | 493 | 477 | 3.28% | 16 |
| 21 | 490 | 477 | 2.65% | 13 |
| | | | | |
| Highest | 514 | 477 | 7.76% | 37 |
| Lowest | 428 | 477 | -10.27% | -49 |
| Overall Range | 86 | 477 | 18.03% | 86 |
| Average | | | 3.23% | 15.4 |

## FCPC Plan 1 - Total Population
## (White, Native American and Black Only

| DISTRICT | Total Pop. | White | % of Total | Native Amer. | % of Total | Black | % of Total |
|---|---|---|---|---|---|---|---|
| 1 | 447 | 435 | 97.32% | 12 | 2.68% | 0 | 0.00% |
| 2 | 514 | 495 | 96.30% | 8 | 1.56% | 1 | 0.19% |
| 3 | 491 | 469 | 95.52% | 6 | 1.22% | 3 | 0.61% |
| 4 | 463 | 448 | 96.76% | 3 | 0.65% | 0 | 0.00% |
| 5 | 476 | 361 | 75.84% | 7 | 1.47% | 96 | 20.17% |
| 6 | 459 | 427 | 93.03% | 21 | 4.58% | 7 | 1.53% |
| 7 | 470 | 221 | 47.02% | 242 | 51.49% | 0 | 0.00% |
| 8 | 488 | 436 | 89.34% | 29 | 5.94% | 0 | 0.00% |
| 9 | 481 | 466 | 96.88% | 12 | 2.49% | 0 | 0.00% |
| 10 | 488 | 474 | 97.13% | 12 | 2.46% | 0 | 0.00% |
| 11 | 492 | 467 | 94.92% | 7 | 1.42% | 4 | 0.81% |
| 12 | 428 | 416 | 97.20% | 11 | 2.57% | 0 | 0.00% |
| 13 | 448 | 97 | 21.65% | 348 | 77.68% | 0 | 0.00% |
| 14 | 471 | 456 | 96.82% | 13 | 2.76% | 0 | 0.00% |
| 15 | 472 | 457 | 96.82% | 11 | 2.33% | 2 | 0.42% |
| 16 | 483 | 454 | 94.00% | 20 | 4.14% | 1 | 0.21% |
| 17 | 492 | 213 | 43.29% | 259 | 52.64% | 0 | 0.00% |
| 18 | 494 | 439 | 88.87% | 42 | 8.50% | 5 | 1.01% |
| 19 | 484 | 435 | 89.88% | 38 | 7.85% | 3 | 0.62% |
| 20 | 493 | 451 | 91.48% | 38 | 7.71% | 2 | 0.41% |
| 21 | 490 | 453 | 92.45% | 34 | 6.94% | 0 | 0.00% |
| | | | | | | | |
| Totals | 10024 | 8570 | 85.49% | 1173 | 11.70% | 124 | 1.24% |

882

### FCPC Plan 1 - Voting Age Population (VAP)
### (White, Native American and Black Only)

| DISTRICT | Voting Age Pop (VAP) | White | % of VAP | Native Amer. | % of VAP | Black | % of VAP |
|---|---|---|---|---|---|---|---|
| 1 | 396 | 392 | 98.99% | 4 | 1.01% | 0 | 0.00% |
| 2 | 373 | 362 | 97.05% | 5 | 1.34% | 1 | 0.27% |
| 3 | 417 | 403 | 96.64% | 5 | 1.20% | 0 | 0.00% |
| 4 | 355 | 347 | 97.75% | 3 | 0.85% | 0 | 0.00% |
| 5 | 381 | 293 | 76.90% | 6 | 1.57% | 72 | 18.90% |
| 6 | 322 | 304 | 94.41% | 14 | 4.35% | 3 | 0.93% |
| 7 | 288 | 163 | 56.60% | 122 | 42.36% | 0 | 0.00% |
| 8 | 363 | 335 | 92.29% | 17 | 4.68% | 0 | 0.00% |
| 9 | 364 | 355 | 97.53% | 6 | 1.65% | 0 | 0.00% |
| 10 | 364 | 357 | 98.08% | 5 | 1.37% | 0 | 0.00% |
| 11 | 368 | 359 | 97.55% | 1 | 0.27% | 2 | 0.54% |
| 12 | 389 | 379 | 97.43% | 9 | 2.31% | 0 | 0.00% |
| 13 | 273 | 66 | 24.18% | 205 | 75.09% | 0 | 0.00% |
| 14 | 335 | 328 | 97.91% | 7 | 2.09% | 0 | 0.00% |
| 15 | 351 | 344 | 98.01% | 5 | 1.42% | 1 | 0.28% |
| 16 | 404 | 388 | 96.04% | 12 | 2.97% | 0 | 0.00% |
| 17 | 306 | 146 | 47.71% | 151 | 49.35% | 0 | 0.00% |
| 18 | 346 | 321 | 92.77% | 21 | 6.07% | 2 | 0.58% |
| 19 | 355 | 329 | 92.68% | 22 | 6.20% | 0 | 0.00% |
| 20 | 370 | 341 | 92.16% | 25 | 6.76% | 2 | 0.54% |
| 21 | 368 | 350 | 95.11% | 17 | 4.62% | 0 | 0.00% |
| Totals | 7488 | 6662 | 88.97% | 662 | 8.84% | 83 | 1.11% |

# FCPC Plan

Forest County, Wisconsin

## *FCPC Plan 2 - Summary of Deviation from Ideal Size*

| DISTRICT | Total Population | Ideal Size | Deviation | Raw Dev. |
|---|---|---|---|---|
| 1 | 447 | 477 | -6.36% | -30 |
| 2 | 514 | 477 | 7.76% | 37 |
| 3 | 491 | 477 | 2.86% | 14 |
| 4 | 463 | 477 | -3.00% | -14 |
| 5 | 497 | 477 | 4.12% | 20 |
| 6 | 459 | 477 | -3.84% | -18 |
| 7 | 470 | 477 | -1.54% | -7 |
| 8 | 495 | 477 | 3.70% | 18 |
| 9 | 481 | 477 | 0.77% | 4 |
| 10 | 484 | 477 | 1.40% | 7 |
| 11 | 472 | 477 | -1.12% | -5 |
| 12 | 428 | 477 | -10.27% | -49 |
| 13 | 448 | 477 | -6.15% | -29 |
| 14 | 471 | 477 | -1.33% | -6 |
| 15 | 472 | 477 | -1.12% | -5 |
| 16 | 483 | 477 | 1.19% | 6 |
| 17 | 492 | 477 | 3.07% | 15 |
| 18 | 494 | 477 | 3.49% | 17 |
| 19 | 484 | 477 | 1.40% | 7 |
| 20 | 493 | 477 | 3.28% | 16 |
| 21 | 490 | 477 | 2.65% | 13 |
| | | | | |
| Highest | 514 | 477 | 7.76% | 37 |
| Lowest | 428 | 477 | -10.27% | -49 |
| Overall Range | 86 | 477 | 18.03% | 86 |
| Average | | | 3.35% | 16.0 |

## FCPC Plan 2 - Total Population
## (White, Native American and Black Only)

| DISTRICT | Total Pop. | White | % of Total | Native Amer. | % of Total | Black | % of Total |
|---|---|---|---|---|---|---|---|
| 1 | 447 | 435 | 97.32% | 12 | 2.68% | 0 | 0.00% |
| 2 | 514 | 495 | 96.30% | 8 | 1.56% | 1 | 0.19% |
| 3 | 491 | 469 | 95.52% | 6 | 1.22% | 3 | 0.61% |
| 4 | 463 | 448 | 96.76% | 3 | 0.65% | 0 | 0.00% |
| 5 | 497 | 382 | 76.86% | 7 | 1.41% | 96 | 19.32% |
| 6 | 459 | 427 | 93.03% | 21 | 4.58% | 7 | 1.53% |
| 7 | 470 | 221 | 47.02% | 242 | 51.49% | 0 | 0.00% |
| 8 | 495 | 428 | 86.46% | 31 | 6.26% | 4 | 0.81% |
| 9 | 481 | 466 | 96.88% | 12 | 2.49% | 0 | 0.00% |
| 10 | 484 | 468 | 96.69% | 14 | 2.89% | 0 | 0.00% |
| 11 | 472 | 464 | 98.31% | 3 | 0.64% | 0 | 0.00% |
| 12 | 428 | 416 | 97.20% | 11 | 2.57% | 0 | 0.00% |
| 13 | 448 | 97 | 21.65% | 348 | 77.68% | 0 | 0.00% |
| 14 | 471 | 456 | 96.82% | 13 | 2.76% | 0 | 0.00% |
| 15 | 472 | 457 | 96.82% | 11 | 2.33% | 2 | 0.42% |
| 16 | 483 | 454 | 94.00% | 20 | 4.14% | 1 | 0.21% |
| 17 | 492 | 213 | 43.29% | 259 | 52.64% | 0 | 0.00% |
| 18 | 494 | 439 | 88.87% | 42 | 8.50% | 5 | 1.01% |
| 19 | 484 | 435 | 89.88% | 38 | 7.85% | 3 | 0.62% |
| 20 | 493 | 451 | 91.48% | 38 | 7.71% | 2 | 0.41% |
| 21 | 490 | 453 | 92.45% | 34 | 6.94% | 0 | 0.00% |
| Totals | 10028 | 8574 | 85.50% | 1173 | 11.70% | 124 | 1.24% |

## FCPC Plan 2 - Voting Age Population (VAP)
## (White, Native American and Black Only)

| DISTRICT | Voting Age Pop (VAP) | White | % of VAP | Native Amer. | % of VAP | Black | % of VAP |
|---|---|---|---|---|---|---|---|
| 1 | 396 | 392 | 98.99% | 4 | 1.01% | 0 | 0.00% |
| 2 | 373 | 362 | 97.05% | 5 | 1.34% | 1 | 0.27% |
| 3 | 417 | 403 | 96.64% | 5 | 1.20% | 0 | 0.00% |
| 4 | 355 | 347 | 97.75% | 3 | 0.85% | 0 | 0.00% |
| 5 | 394 | 306 | 77.66% | 6 | 1.52% | 72 | 18.27% |
| 6 | 322 | 304 | 94.41% | 14 | 4.35% | 3 | 0.93% |
| 7 | 288 | 163 | 56.60% | 122 | 42.36% | 0 | 0.00% |
| 8 | 357 | 327 | 91.60% | 15 | 4.20% | 2 | 0.56% |
| 9 | 364 | 355 | 97.53% | 6 | 1.65% | 0 | 0.00% |
| 10 | 376 | 366 | 97.34% | 8 | 2.13% | 0 | 0.00% |
| 11 | 353 | 349 | 98.87% | 0 | 0.00% | 0 | 0.00% |
| 12 | 389 | 379 | 97.43% | 9 | 2.31% | 0 | 0.00% |
| 13 | 273 | 66 | 24.18% | 205 | 75.09% | 0 | 0.00% |
| 14 | 335 | 328 | 97.91% | 7 | 2.09% | 0 | 0.00% |
| 15 | 351 | 344 | 98.01% | 5 | 1.42% | 1 | 0.28% |
| 16 | 404 | 388 | 96.04% | 12 | 2.97% | 0 | 0.00% |
| 17 | 306 | 146 | 47.71% | 151 | 49.35% | 0 | 0.00% |
| 18 | 346 | 321 | 92.77% | 21 | 6.07% | 2 | 0.58% |
| 19 | 355 | 329 | 92.68% | 22 | 6.20% | 0 | 0.00% |
| 20 | 370 | 341 | 92.16% | 25 | 6.76% | 2 | 0.54% |
| 21 | 368 | 350 | 95.11% | 17 | 4.62% | 0 | 0.00% |
| Totals | 7492 | 6666 | 88.97% | 662 | 8.84% | 83 | 1.11% |

# Plaintiff Plan 2
## *Within PlanTentative*

Forest County, Wisconsin

Exhibit C
FCPC
Plan 2

*Districts 5,7,8,10 & 11 changed in Plaintiff Plan 2*

## FCPC Plan 3 - Summary of Deviation from Ideal Size

| DISTRICT | Total Population | Ideal Size | Deviation | Raw Dev. |
|---|---|---|---|---|
| 1 | 447 | 477 | -6.36% | -30 |
| 2 | 514 | 477 | 7.76% | 37 |
| 3 | 491 | 477 | 2.86% | 14 |
| 4 | 463 | 477 | -3.00% | -14 |
| 5 | 468 | 477 | -1.96% | -9 |
| 6 | 483 | 477 | 1.19% | 6 |
| 7 | 481 | 477 | 0.77% | 4 |
| 8 | 473 | 477 | -0.91% | -4 |
| 9 | 492 | 477 | 3.07% | 15 |
| 10 | 486 | 477 | 1.82% | 9 |
| 11 | 471 | 477 | -1.33% | -6 |
| 12 | 428 | 477 | -10.27% | -49 |
| 13 | 448 | 477 | -6.15% | -29 |
| 14 | 471 | 477 | -1.33% | -6 |
| 15 | 472 | 477 | -1.12% | -5 |
| 16 | 483 | 477 | 1.19% | 6 |
| 17 | 492 | 477 | 3.07% | 15 |
| 18 | 494 | 477 | 3.49% | 17 |
| 19 | 484 | 477 | 1.40% | 7 |
| 20 | 493 | 477 | 3.28% | 16 |
| 21 | 490 | 477 | 2.65% | 13 |
|  |  |  |  |  |
| Highest | 514 | 477 | 7.76% | 37 |
| Lowest | 428 | 477 | -10.27% | -49 |
| Overall Range | 86 | 477 | 18.03% | 86 |
| Average |  |  | 3.09% | 14.8 |

# Plaintiff Plan 3

## *Within PlanTentative*

Forest County, Wisconsin

Exhibit D
HCPC
Plan 3

Districts 5,6,7,8,9,10 & 11
changed in Plaintiff Plan 3

## FCPC Plan 3 - Total Population
### (White, Native American and Black Only)

| DISTRICT | Total Pop. | White | % of Total | Native Amer. | % of Total | Black | % of Total |
|---|---|---|---|---|---|---|---|
| 1 | 447 | 435 | 97.32% | 12 | 2.68% | 0 | 0.00% |
| 2 | 514 | 495 | 96.30% | 8 | 1.56% | 1 | 0.19% |
| 3 | 491 | 469 | 95.52% | 6 | 1.22% | 3 | 0.61% |
| 4 | 463 | 448 | 96.76% | 3 | 0.65% | 0 | 0.00% |
| 5 | 468 | 446 | 95.30% | 16 | 3.42% | 2 | 0.43% |
| 6 | 483 | 460 | 95.24% | 14 | 2.90% | 5 | 1.04% |
| 7 | 481 | 135 | 28.07% | 234 | 48.65% | 96 | 19.96% |
| 8 | 473 | 418 | 88.37% | 29 | 6.13% | 4 | 0.85% |
| 9 | 492 | 470 | 95.53% | 18 | 3.66% | 0 | 0.00% |
| 10 | 486 | 464 | 95.47% | 11 | 2.26% | 0 | 0.00% |
| 11 | 471 | 459 | 97.45% | 8 | 1.70% | 0 | 0.00% |
| 12 | 428 | 416 | 97.20% | 11 | 2.57% | 0 | 0.00% |
| 13 | 448 | 97 | 21.65% | 348 | 77.68% | 0 | 0.00% |
| 14 | 471 | 456 | 96.82% | 13 | 2.76% | 0 | 0.00% |
| 15 | 472 | 457 | 96.82% | 11 | 2.33% | 2 | 0.42% |
| 16 | 483 | 454 | 94.00% | 20 | 4.14% | 1 | 0.21% |
| 17 | 492 | 213 | 43.29% | 259 | 52.64% | 0 | 0.00% |
| 18 | 494 | 439 | 88.87% | 42 | 8.50% | 5 | 1.01% |
| 19 | 484 | 435 | 89.88% | 38 | 7.85% | 3 | 0.62% |
| 20 | 493 | 451 | 91.48% | 38 | 7.71% | 2 | 0.41% |
| 21 | 490 | 453 | 92.45% | 34 | 6.94% | 0 | 0.00% |
| | | | | | | | |
| Totals | 10024 | 8570 | 85.49% | 1173 | 11.70% | 124 | 1.24% |

## FCPC Plan 3 - Voting Age Population
## (White, Native American and Black Only)

| DISTRICT | Voting Age Pop (VAP) | White | % of VAP | Native Amer. | % of VAP | Black | % of VAP |
|---|---|---|---|---|---|---|---|
| 1 | 396 | 392 | 98.99% | 4 | 1.01% | 0 | 0.00% |
| 2 | 373 | 362 | 97.05%. | 5 | 1.34% | 1 | 0.27% |
| 3 | 417 | 403 | 96.64% | 5 | 1.20% | 0 | 0.00% |
| 4 | 355 | 347 | 97.75% | 3 | 0.85% | 0 | 0.00% |
| 5 | 363 | 348 | 95.87% | 12 | 3.31% | 1 | 0.28% |
| 6 | 357 | 344 | 96.36%. | 9 | 2.52% | 2 | 0.56% |
| 7 | 297 | 97 | 32.66% | 117 | 39.39% | 72 | 24.24% |
| 8 | 341 | 314 | 92.08% | 15 | 4.40% | 2 | 0.59% |
| 9 | 366 | 353 | 96.45% | 9 | 2.46% | 0 | 0.00% |
| 10 | 355 | 346 | 97.46% | 5 | 1.41% | 0 | 0.00% |
| 11 | 371 | 364 | 98.11% | 4 | 1.08% | 0 | 0.00% |
| 12 | 389 | 379 | 97.43% | 9 | 2.31% | 0 | 0.00% |
| 13 | 273 | 66 | 24.18% | 205 | 75.09% | 0 | 0.00% |
| 14 | 335 | 328 | 97.91% | 7 | 2.09% | 0 | 0.00% |
| 15 | 351 | 344 | 98.01%. | 5 | 1.42% | 1 | 0.28% |
| 16 | 404 | 388 | 96.04% | 12 | 2.97% | 0 | 0.00% |
| 17 | 306 | 146 | 47.71%. | 151 | 49.35% | 0 | 0.00% |
| 18 | 346 | 321 | 92.77% | 21 | 6.07% | 2 | 0.58% |
| 19 | 355 | 329 | 92.68%. | 22 | 6.20% | 0 | 0.00% |
| 20 | 370 | 341 | 92.16%. | 25 | 6.76% | 2 | 0.54% |
| 21 | 368 | 350 | 95.11%. | 17 | 4.62% | 0 | 0.00% |
| Totals | 7488 | 6662 | 88.97% | 662 | 8.84% | 83 | 1.11% |

# 1991 Plan
## Forest County, WI

Exhibit E
1991
County Plan

